CITY OF BAYONNE, A MUNICIPAL CORPORATION OF THE
STATE OF NEW JERSEY, THE BOARD OF EDUCATION
OF THE CITY OF BAYONNE AND THE BOARD OF
SCHOOL ESTIMATE OF THE CITY OF BAYONNE, PETI-
TIONERS-APPELLANTS, v. CARL L. MARBURGER, COM-
MISSIONER, DEPARTMENT OF EDUCATION OF THE
STATE OF NEW JERSEY, RESPONDENT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 11, 1968—Decided March 18, 1968.

88

Before Judges GOLDMANN, KILKENNY and CARTON.

*Mr. James P. Dugan* argued the cause for appellant City of Bayonne.

*Mr. John J. Pagano* argued the cause for appellants Board of Education and Board of School Estimate.

*Mr. Stephen G. Weiss,* Deputy Attorney General, argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D.   This is an appeal from a determination of the State Board of Education (State Board) unanimously affirming the decision of the Commissioner of Education (Commissioner) denying the request of the Bayonne School District (Bayonne) that it be permitted to raise its "local share" under the School Building Aid Law, *N. J. S.* 18A:58–20 *et seq.,* formerly *N. J. S. A.* 18:10–29.49 *et seq.,* by the issuance of bonds. The sole issue presented is whether Bayonne may raise its local share in the manner it proposes rather than by a tax levy. We hold it may not.

Acting upon the statutorily prescribed formula, *N. J. S.* 18A–58–23 (formerly *N. J. S. A.* 18:10–29.52, as amended), the New Jersey Department of Education computed the capital foundation program for Bayonne for the 1968-69 school year to be $398,655. Of this amount Bayonne was required, under *N. J. S.* 18A:58–24(a) (formerly *N. J. S. A.* 18:10–29.53(a), as amended) to raise the sum of $258,957 as its local share. The State, in turn, would then contribute the balance of $139,698 as the maximum state building aid

available. In January 1968 Bayonne informed Assistant Commissioner of Education Kilpatrick that it intended to raise its local share by issuing bonds in lieu of taxation.

Bayonne had a year earlier requested permission to utilize this alternative procedure for the 1967-68 school year. At that time Assistant Commissioner Kilpatrick twice informed the attorney for the Bayonne Board of Education that Bayonne's local share had to be raised by taxation; a proposed bond issue would not qualify Bayonne for state building aid under the capital foundation program. The City of Bayonne thereafter raised its local share for the 1967–68 school year by taxation.

When Bayonne renewed its bond issue proposal in January 1968, Assistant Commissioner Kilpatrick again advised that the school district would not qualify for receipt of the $139,698 in state aid unless it raised its local share of $258,957 by taxation. His letter gave a more detailed explanation of the Department's view of the unsoundness of Bayonne's request:

"Since 1956, when the State School Building Aid Act was enacted, the Division of Business and Finance has uniformly required school districts to raise their annual local fair share only by means of an annual tax levy. The Division has never considered the Act as permitting any alternative method. Indeed, to my knowledge, no school district has ever sought eligibility for building aid on any other basis, nor objected to the Division's interpretation.

In my opinion, the plain meaning and intent of the State School Building Aid Act required the annual local fair share to be raised by a tax levy. As you know, school districts, under the Act, must annually establish a capital foundation program. This procedure, based as it is upon an annual budget concept, does not reasonably permit inclusion of non-revenue receipt items such as bonds or notes. These non-revenue items, of course, would not be compatible with the annual budget concept of the capital foundation program. If such items could be included then, at the time of the payment of the debt, itself, there would be created a further eligibility for state building aid even though the total amount of the debt would already have provided an eligibility in a previous year. In my opinion the legislature intended no such anomaly.

"In essence, it has been, and continues to be my belief that the legislation establishing the state school building aid procedure contemplates a yearly partnership between the state and local school districts, each of which are called upon to annually provide, through tax sources, for the ensuing school year capital foundation program. This procedure for an equal, annual tax effort does not envision the introduction of nonrevenue receipt items such as bonds or notes to establish eligibility. While I appreciate that municipalities may prefer to maintain a stable tax rate, I do not believe that the alternative which is apparently contemplated is permissible under existing law."

Bayonne then requested the Commissioner to review that determination, and its officials were accorded the opportunity of presenting their contentions to him. On February 2, 1968 he wrote the local school board stating that he concurred in the Assistant Commissioner's determination. He, too, noted that non-revenue receipt items, such as bonds or notes, did not accord with the concept projected in the School Building Aid Law. He said that:

"If the device here proposed [a school bond issue] were permissible, the net result would be that the State would pay State building aid twice on the same amount of local fair share: first, on a local fair share raised by a bond issue, and second, on the annual payments of interest and principal on the same bonds. The Commissioner can find no justification in the statutes for such double payment. The statutes cannot be construed to produce an anomalous result."

In other words, were Bayonne to issue bonds in order to raise its 1968-69 school year local share, it would not only qualify for the state school building aid contribution for that school year but, in addition, would be incurring an indebtedness whose annual debt service payments would establish an additional eligibility under the School Building Aid Law.

Bayonne appealed the Commissioner's determination to the State Board which, as noted, unanimously affirmed his action.

Examination of the School Building Aid Law establishes the soundness of the administrative determination here under review.

The school building aid concept was first enacted into law by *L.* *1956, c.* 8 (*N. J. S. A.* 18:10–29.49 *et seq.*), whose title pointed out its essential purpose:

"An Act to authorize the payment of State grants-in-aid to certain school districts, for school facilities, and requiring the State Treasurer to maintain capital reserve funds for the administration of such grants-in-aid and through monies applicable thereto, supplementing Title 18 ["Education"] of the Revised Statutes."

The Statement to the bill (Senate Bill 2) read:

"The purpose of this bill is to carry out the essential recommendations of the Eighth Report of the Commission on State Tax Policy. It provides for the accumulation of capital reserve funds at the option of school districts, and for State aid applicable to such reserves and to debt service and capital outlay expenditures."

The Eighth Report of the Commission on State Tax Policy (May 1955), to which the Statement referred, was devoted exclusively to the subject of "Financing School Buildings in New Jersey." In that report the Commission, after pointing out the urgency of school building needs in many parts of the State, said that the time had come "when the financing of capital requirements should be planned in an orderly way and at a minimum cost to the state and its local school districts, if we are to avoid recurring emergencies as new school facilities become necessary." The Commission made two basic proposals, only the first of which concerns us here:

"First: Establish an annual capital foundation program at a level calculated to spread the cost of modest, but adequate, school facilities over the useful life of those facilities and provide for state-local sharing of the capital foundation program costs *according to the taxable resources of local school districts in the same manner as presently provided in the sharing of current operating foundation program costs* [*N. J. S.* 18A:58–1 *et seq.,* formerly *N. J. S. A.* 18:10–29.30 *et seq.*]" (*page* VII; italics ours)

In its summary of the capital foundation program, where the proposal just quoted was repeated, the Commission went on to explain that

"The local fair share *tax rate* for the support of the capital and current foundation programs shall be increased from the 5 mills to 5.5 mills per dollar of full valuation of taxable property in the school district (from 50 cents to 55 cents per $100) as equalized by the State Division of Taxation." (at *page* X; italics ours)

It is entirely clear from the above, as well as chapter II ("A Plan of Action") of the Commission's Eighth Report (at *pages* 13 through 21), that what the Commission proposed was a uniform, annual local tax effort that would provide a constant annual response to capital requirements.

It was in direct response to the Eighth Report that the State Building Aid Law (*L.* 1956, *c.* 8) was passed the following year. That act clearly reflected the concept of an annual tax effort by the State and by local school districts. The new "capital foundation program" was expressly defined as "the amount annually determined pursuant to section 4 of this act." *N. J. S. A.* 18:10–29.50. Section 4 (*N. J. S. A.* 18:10–29.52) provided that

"The capital foundation program shall be computed *annually* for each school district as the sum of the amount appropriated by or for the school district *in each school budget or in a municipal budget* for purposes of capital outlay, debt service and net addition to its capital reserve fund, but not exceeding $30.00 per pupil in average daily enrollment." (Italics ours)

(Section 4 presently appears as *N. J. S.* 18A:58–23, the last part of the quoted section now reading "* * * for purposes of (1) debt service, (2) capital outlay and (3) net addition to its capital reserve fund, but not exceeding $45.00 per pupil in resident enrollment.")

Section 5(a) of the act (*N. J. S. A.* 18:10–29.53, now *N. J. S.* 18A:58–24) prescribed the formula by which the school district's local share was to be determined, the re-

mainder constituting the district's building aid allowance to be contributed by the State:

"(a) There shall be deducted from the amount of the capital foundation program of each district a local share equal to $0.05 per $100.00 (½ mill per $1.00) upon the equalized full valuation of the taxing district or districts within the school district, as certified by the Director of the State Division of Taxation to the Commissioner pursuant to law, for the year in which the calculation is required to be made. The remainder shall constitute the district's building aid allowance."

(By amendment, the $0.05 has been changed to $0.075 per $100, or 3/4 mills per $1.)

The "building aid allowance" or State's share, mentioned in section 5(a), was defined, in section 2 of the 1956 act, as an allowance to be computed and determined annually in accordance with the act. See *N. J. S. A.* 18:10–29.50, now *N. J. S.* 18A:58–21. And section 10 (*N. J. S. A.* 18:10–29.58, now *N. J. S.* 18A:58–29) directed that the Commissioner of Education make a determination on or before November 15 in each year of the maximum building aid allowance available to each school district, and estimate the amount the State would have to appropriate to carry out the provisions of the act for the succeeding school year. He was to make such determination and estimate upon the basis of the average daily enrollment (now resident enrollment) of the district, and determine the local fair share for the current calendar year. He was then promptly to certify to each school district the maximum building aid allowance so determined, that the school district might include the amount certified in its next ensuing school budget as anticipated revenue (see *N. J. S. A.* 18:10–29.59, now *N. J. S.* 18A:58–30). All sums so received or set aside for a board of education or municipality were to be applied "first, to debt service on bonds issued by such board of education or municipality for school purposes; secondly, to capital outlay for school purposes; and lastly, to addition to the capital reserve fund

of such school district." *N. J. S. A.* 18:10–29.59, now *N. J. S.* 18A:58–30.

It is immediately apparent that the School Building Aid Law is founded upon principles of annual financing: the "capital foundation program" is the sum of three annual appropriations; the "local share" is computed annually on the basis of the equalized full valuation of the taxing district or districts within the school district; the "building aid allowance" is to be incorporated into the annual budget as anticipated revenue for the next school year, and the funds when received are to be applied annually for certain designated purposes. As Bayonne was informed by the Assistant Commissioner and the Commissioner of Education, the use of non-revenue receipt items such as bonds is incompatible with the annual budget concept—an interpretation finding complete support in the legislative history of the act, based as it was upon the Eighth Report of the State Tax Policy Commission.

We therefore conclude that the "local share" is an appropriation which must be raised by taxation.

The matter may be viewed in yet another light. *N. J. S.* 18A–24–5 (formerly *R. S.* 18:6–66), applicable to municipalities like the City of Bayonne, provides that "projects for which bonds may be issued * * * shall be as follows": (1) the acquisition or construction of buildings and the improvement of their sites; (2) the reconstruction, remodeling, alteration, enlargement, or addition to or major repair of buildings and the improvement of their sites; (3) the acquisition and improvement of lands for school purposes, and (4) the purchase of furniture, equipment and apparatus for school purposes. See, also, *N. J. S.* 18A:24–61, which provides for the issuance of renewal or refunding bonds. What Bayonne seeks to do here is to issue bonds so that it may obtain state school building aid, a purpose not authorized by the sections of the Education Act just cited. The fact that Bayonne intends to use the state funds in projects for which bonds could be issued is of no moment; the interven-

ing step (application for and receipt of state aid under the School Building Aid Law) has taken the proposed bond issue outside the strict limits of the statute.

Accordingly, the determination of the State Board of Education is affirmed.